# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHANIE M. KANE, | : | CIVIL NO. 1:24-cv-01771 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

## I.  Introduction.

In this social security action, Plaintiff Stephanie M. Kane ("Kane") seeks

judicial review of the adverse portion of the final decision of the Commissioner of

Social Security ("Commissioner") partially denying her claims for disability

insurance benefits and supplemental security income under Titles II and XVI of the

Social Security Act.  We have jurisdiction under 42 U.S.C. §§ 405(g) and

---

[1] Frank Bisignano is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

1383(c)(3).  For the reasons set forth below, we will affirm the Commissioner's decision and enter judgment in favor of the Commissioner.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 10-1 to 10-16.*[2]  In 2019, Kane protectively filed[3] an application for disability insurance benefits and an application for supplemental security income, alleging that she has been disabled since January 11, 2017. *Admin. Tr.* at 379–88.  After her claim at the initial and reconsideration levels of administrative review were denied, Kane requested an administrative hearing. *Id.* at 264–88.  On February 8, 2021, Kane— who was represented by counsel—as well as a vocational expert testified at a telephonic hearing before Administrate Law Judge Charles Dominick (the "ALJ"). *Id.* at 128–74.  On March 3, 2021, the ALJ denied Kane's claim for benefits. *Id.* at 105–20.  Kane appealed the ALJ's decision to the Appeals Council, which denied her request for review. *Id.* at 1–5, 376–78.

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Kane's claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*

Kane then filed a civil complaint in this court seeking judicial review of the ALJ's unfavorable decision. *Id.* at 2018–20. On September 18, 2023, this court remanded the case to the Commissioner for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). *Id.* at 2021–39. The Appeals Council then remanded the case to the ALJ for further proceedings consistent with this court's order. *Id.* at 2040–43. On April 1, 2024, the ALJ held a second administrative hearing, at which Kane amended her onset date to April 21, 2017. *Id.* at 1989–2015. On July 30, 2024, the ALJ determined that Kane "was not disabled prior to April 21, 2022, but became disabled on that date and has continued to be disabled through the date of this decision." *Id.* at 1976. The Appeals Council did not review the ALJ's decision. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

On October 16, 2024, Kane, represented by counsel, began this action by filing a complaint seeking review of the adverse portion of the Commissioner's decision denying her claim. *See doc. 1.* She requests that the court reverse the adverse portion of the Commissioner's decision and award her benefits or, in the alternative, remand the case for further proceedings. *Id.* at 3 (Wherefore Clause). She also seeks "such relief" as the court deems justified, including attorney's fees. *Id.* at 3–4.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 19*.  The Commissioner filed an answer and a certified transcript of the administrative proceedings. *Docs. 9–10*.  The parties filed briefs (*see docs. 14, 16–17*), and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103.  Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*,

48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Kane is disabled, but whether substantial evidence supports the Commissioner's finding that she is not disabled and whether the Commissioner correctly applied the relevant law.

### B.  Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II or Title XVI of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

5

*see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To

satisfy this requirement, a claimant must have a severe physical or mental

impairment that makes it impossible to do his or her previous work or any other

substantial gainful work that exists in the national economy. 42 U.S.C.

§§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).

Further, to receive disability insurance benefits under Title II of the Social

Security Act, a claimant must show that he or she contributed to the insurance

program, is under retirement age, and became disabled prior to the date on which

he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).[4]  Unlike

with disability insurance benefits under Title II of the Social Security Act,

"[i]nsured status is irrelevant in determining a claimant's eligibility for

supplemental security income benefits" under Title XVI of the Social Security Act.

*Snyder v. Colvin*, No. 3:16-CV-01689, 2017 WL 1078330, at *1 (M.D. Pa. Mar.

22, 2017).  Supplemental Security Income "is a federal income supplement

---

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id*. (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Kane met the insured-status requirements through March 31, 2019. *Admin. Tr.* at 1961.

program funded by general tax revenues (not social security taxes)" "designed to help aged, blind or other disabled individuals who have little or no income." *Id.*

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

## IV.  The ALJ's Decision.

On July 30, 2024, the ALJ partially denied Kane's claim for benefits. *Admin. Tr.* at 1956–77.  He proceeded through the five-step sequential-evaluation process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Kane had not engaged in substantial gainful activity from April 21, 2017, the amended alleged onset date, through May 1, 2022. *Id.* at 1962.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Kane had the following severe impairments: "degenerative disc disease/dysfunction of the lumbar spine; bilateral de Quervain's tenosynovitis, status-post surgery on the right hand; degenerative joint disease/status-post surgery of the left shoulder; degenerative joint disease of the right knee; hypothyroidism; hypertension; obstructive sleep apnea; obesity; obsessive- compulsive disorder; panic disorder; and major depressive disorder."[5] *Id.*

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that Kane did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at

---

[5] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to the record.

1962–66.  Specifically, the ALJ considered Listings 1.15, 1.18, and 11.14 with respect to Kane's physical impairments. *Id.* at 1962–64.  Noting that there is no specific listing regarding hypothyroidism, hypertension, and obstructive sleep apnea, he concluded that the evidence does not indicate that these impairments in combination with other impairments meets or medically equals any listing. *Id.* at 1964.  The ALJ also considered Kane's obesity in determining whether her "impairments meet or equal any listing" as required by the regulations. *Id.* (citing SSR 19-2p).  Ultimately, the ALJ concluded that the evidence does not support a finding that Kane's "obesity, considered alone and in combination with the [] other impairments medically equals a listed impairment." *Id.*

The ALJ also considered Listings 12.04, 12.06, and 12.08 with respect to Kane's mental impairments. *Id.*  In doing so, he considered the four broad areas of

10

mental functioning set forth in the disability regulations for evaluating mental disorders[6] and in the listing, known as paragraph B criteria.[7]  *Id.*

The ALJ determined that Kane had a moderate limitation in understanding, remembering, or applying information. *Id.* at 1964.  He acknowledged that Kane "testified that she experiences memory deficits, in that she forgets to take her medication, eat at times, where she is and where she is going while driving, and what she says when talking to friends[;]" "that she needs reminders to take medication, care for her personal hygiene, and go places[;]" and that she has

---

[6] When "mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis." *Hess*, 931 F.3d at 202.  The regulations set forth a "special technique" used for evaluating mental impairments. *See* 20 C.F. R. § 404.1520a.  As part of that "special technique," a claimant's degree of functional limitation is rated in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* at § 404.1520a(c)(3).  A claimant's degree of limitation in these functional areas is rated using "the following five-point scale: None, mild, moderate, marked, and extreme." *Id.* at § 404.1520a(c)(4).  The ratings in these four broad functional areas are used at Step 2 to determine if the claimant has a severe mental impairment, and if the claimant has a severe mental impairment, the ratings are also used at Step 3 to determine if the claimant's severe mental impairment meets or equals a listed mental disorder. *Id.* at § 404.1520a(d).

[7] The listings for mental disorders contain either two paragraphs (A and B) or three paragraphs (A, B, and C). *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.A.2.  Except as to Listing 12.05 (intellectual disorder), paragraph B of each of the listings for the mental disorders sets forth the same four functional criteria as set forth in 20 C.F. R. § 404.1520a, and the listings use the same five-point rating scale as those regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.A.2.b, 12.00.E, 12.00.F.  This is what the ALJ is referring to when he refers to the paragraph B criteria.

"difficulties following both written and spoken instructions." *Id.*  But the ALJ noted that Kane's mental status examinations revealed "alert and oriented behavior, intact language processing skills, fair to intact memory skills, and coherent and logical thought processes." *Id.*  The ALJ also recognized that despite Kane's subjective reports of memory deficits, Kane was "negative for overt issues with any aspect of memory" and treatment notes revealed "intact immediate, recent, and remote memory." *Id.*

The ALJ determined that Kane had a moderate limitation in interacting with others. *Id.* at 1964–65.  In this regard, the ALJ recognized Kane's new reports of difficulty getting along with her family members, difficulty getting along well with authority figures in the past, being fired due to difficulties getting along with others, and an inability to shop in stores due to panic attacks. *Id.* at 1965. However, the ALJ noted that Kane reported that she was fired because she could not go into work every day, shops in stores for food, goes to her brother's house on holidays, and texts a few friends. *Id.*  The ALJ also recognized that "[i]n August 2019, Kane took a trip to Philadelphia with a friend to attend a concert, which is inconsistent with her testimony of an inability to function outside of her bedroom." *Id.*  Treatment records further indicated Kane's ability to "maintain friendships and a relationship with her niece and that she has been donating plasma for supplemental money twice a week." *Id.*  Treatment notes further remarked

12

"cooperative demeanor; good eye contact; somewhat rapid at times, but clear and fluent speech; and no reported delusions, paranoia, or homicidal ideations." *Id.* The ALJ also asserted that "[w]hile the record notes questionable reports of mild hallucinations, she also reported that they have not been bothering her, the treatment records note no overt evidence of psychosis at that time, and the record reflects such reports during periods when she is over tired [sic] and are generally devoid of demonstrated hallucinations on mental status examinations." *Id.*

The ALJ also determined that Kane had a moderate limitation in concentrating, persisting, or maintaining pace. *Id.* In this regard, the ALJ stated that Kane reported "concentration difficulties and the inability to complete tasks," "difficulties following both written and spoken instructions[,] and that she is unable to manage her personal finances." *Id.* He also noted that "mental status examinations from [] December 2020 generally describe alert and oriented behavior, normal to fair attention and concentration skills, and coherent, logical, and relevant thought processes without consistently reported thought blocking, inattention, preoccupations, flight of ideas, tangents, or circumstantiality." *Id.* The ALJ also recognized that "[w]hile [] [Kane]'s social worker noted some obsessive thought processes with flight of ideas, circumstantiality, and tangentiality on the treatment records, such reports are not noted on medication management mental

13

status examinations and more recently, in February 2022, the social worker noted an improvement in these issues." *Id.*

The ALJ further determined that Kane had a mild limitation in adapting or managing oneself. *Id.* at 1966.  He stated that Kane lives alone, cares for her cat, performs some household chores, drives, and leaves her house unaccompanied. *Id.* The ALJ noted that despite Kane's history of impulsive behavior and variations in mood and affect, the record displayed "intact impulsivity during the period at issue" and "no ongoing significant clinical abnormalities." *Id.*  Further, Kane has not shown "an inability to set realistic goals, make plans independent of others, travel to unfamiliar places, avoid normal hazards, or take appropriate precautions." *Id.*

The ALJ further determined that Kane did not satisfy the paragraph C criteria given her capability of self-sustainment and adjustment to minor changes in mental demands. *Id.*  Moreover, Kane has not required psychiatric hospitalization or emergency care visits for her mental impairments. *Id.*

### D.  The RFC.

The ALJ then determined that from April 21, 2017, through May 1, 2022, Kane had the RFC to perform light work with the following limitations: (1) she "must have been given the opportunity to alternate between sitting and standing at least every 30 minutes"; (2) she "was limited to occasional stooping, kneeling,

crouching, and climbing on ramps and stairs, but never crawling and never climbing on ladders, ropes, or scaffolds"; (3) she "must have avoided unprotected heights and dangerous moving machinery"; (4) she "must have avoided overhead reaching with the left upper extremity and was limited to no more than frequent handling and fingering"; (5) she "was limited to no more than occasional use of foot controls"; (6) she "was able to understand, remember, and carry out simple instructions, but she would have had to avoid fast-assembly line type work"; (7) she "was limited to no more than occasional changes in the work setting"; and (8) she "was limited to occasional interaction with supervisors, coworkers, and the public." *Id.*

In making this RFC assessment, the ALJ considered all of Kane's symptoms as far as they can reasonably be accepted as consistent with objective medical evidence. *Id.* at 1966–74. The ALJ concluded that although Kane's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the reasons explained in this decision." *Id.* at 1968. The ALJ also considered Kane's medical records and Kane's activities of daily living. *Id.* at 1968–72.

The ALJ further considered the opinions in the record and prior administrative findings entered into testimony. *Id.* at 1972–73. Specifically, he

15

considered—and found persuasive—the opinions of the state agency medical

consultants. *Id.* at 1972.  He also considered the opinion of the consultative

medical examiner, Marielle Stone, MD ("Dr. Stone").  *Id.* at 1972–73.  The ALJ

found the examiner's opinion to be partially persuasive:

> While the consultative examination itself, described in detail above that notes abnormal gait, reduced squat, and reduced shoulder and lumbar range of motion, it was otherwise generally within normal limits. More specifically, it also noted no use of an assistive device, normal stance, and the ability to walk on heels and toes without difficulty. However, the undersigned does not find this opinion fully persuasive, as it seems to provide for significant accommodations for impairments, such as the claimant's alleged knee and back pain. However, the medical records since the alleged onset date documents relatively benign clinical findings and limited treatment until recently. More specifically, despite more recent treatment with physical therapy and injections, the record does not reflect use of an assistive device for ambulation and treatment records consistently describe normal gait, intact sensation, and 5/5 strength in the bilateral lower extremities. Additionally, the claimant testified at the initial hearing that she has not received any treatment for her alleged knee pain in approximately the last five years. Treatment records from September 2018 also note reports that the claimant was painting her basement floor. As such, despite the representative's argument that this opinion alone supports sedentary exertion work, the longitudinal evidence and the consultative examinations findings themselves do not support and are inconsistent with greater limitations than those provided herein.

*Id.* at 1973.  As to Kane's mental impairments, the ALJ considered—and found

persuasive—the opinions of the state agency psychological consultants. *Id.*

16

Finally, the ALJ considered the opinion of Matthew Berger, M.D. ("Dr. Berger").

*Id.* The ALJ found Dr. Berger's opinion to be not persuasive:

> [Dr. Berger's opinion] is generally inconsistent with and not supported by the evidence of record, including his own treatment notes, described in detail above. More specifically, mental status examinations fail to describe significant memory, attention, or concentration deficits and while they were positive for variations in mood, the objective evidence does not support the degree of limitations opined by Dr. Berger, as mental status examinations were generally devoid of ongoing significant clinical abnormalities. Additionally, while the opinion references agoraphobia and panic when leaving her house, treatment records also reflect that the claimant was able to attend a concert in Philadelphia during the period at issue. Although the claimant testified that she left early, as noted above, considering the claimant's testimony and reports of significant issues leaving her home, her belief that she could travel to and attend a heavy metal rock concert is inconsistent with her reports. The record also reflects that she has maintained friendships and a relationship with her niece, was planning on attending a picnic hosted by her cousin, and was donating plasma twice a week for income. Additionally, the claimant testified at the initial hearing that she drives to a friend's house approximately one to two times per week.

*Id.* The ALJ also considered the opinions of the state agency medical and psychological consultants for Kane's subsequent claim filed on May 2, 2022, but noted that "this particular opinion was based on information and medical treatment after the current period at issue." *Id.* Finally, the ALJ considered the statements submitted by Kane's fiancé and the Global Assessment of Functioning ("GAF") scores of record. *Id.* at 1973–74. The ALJ found the fiancé's statements were inconsistent with the objective medical evidence and that the GAF scores "only

represent a snapshot opinion that does not provide a longitudinal opinion" and "only characterize [] [Kane]'s mental status within the context of broad and generalized categories." *Id.* Ultimately, the ALJ found Kane was "capable of performing a range of light exertional unskilled work within the above parameters." *Id.* at 1974.

### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Kane was unable to perform her past relevant work from April 21, 2017, through May 1, 2022. *Id.* The ALJ accepted the testimony of the vocational expert that an individual of the same age, education, work experience, and RFC as Kane would be unable to perform her past relevant work as a user support analyst or telephone solicitor. *Id.*

### F.  Step Five.

At step five of the sequential-evaluation process, considering Kane's age, education, work experience, and RFC, as well as the testimony of a vocational expert, the ALJ found that there were jobs—such as office helper, postage machine operator, and mail clerk—that exist in significant numbers in the national economy that Kane could perform. *Id.* at 1974–75.

In sum, the ALJ concluded that Kane "was not disabled prior to April 21, 2022, but became disabled on that date and has continued to be disabled through the date of this decision." *Id.* at 1976. Thus, he partially denied Kane's claim for benefits. *Id.*

## V. Discussion.

Kane presents three claims. First, she claims that the ALJ rejected the opinion of her treating psychiatrist for erroneous reasons, in violation of the regulations and the law of the Third Circuit. *Doc. 14* at 4–11. Second, Kane claims that the ALJ's treatment of Dr. Stone's opinion warrants a finding of disability prior to April 21, 2017. *Id.* at 11–13. Specifically, she contends the ALJ failed to include Dr. Stone's limitation—only occasional reaching in all directions with the left arm—in the RFC without explanation. *Id.* Third, Kane claims that the ALJ failed to include all credibly established limitations in her RFC and hypothetical questions to the vocational expert. *Id.* at 14. Alternatively, Kane argues there is not substantial evidence of work that she could perform. *Id.* at 14–15.

**A. The RFC and Opinion Testimony.**

Because Kane's claim involves the ALJ's RFC assessment and opinion testimony, before addressing the merits of Kane's claim, we set forth general standards regarding the RFC assessment and the evaluation of opinion testimony.

### 1.  The RFC.

"The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett*, 220 F.3d at 121 (quoting Hartranft, 181 F.3d at 359 n.1).  In assessing a claimant's RFC, the ALJ must consider all the evidence of record. *Burnett*, 220 F.3d at 121.  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Mason, 994 F.2d at 1066).  The court's "review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Wilder v. Kijakazi*, No. 1:20-CV-492, 2021 WL 4145056, at *6 (M.D. Pa. Sept. 9, 2021); *see also Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) ("We examine the ALJ's conclusions as to [the claimant's]

20

residual functional capacity with the deference required of the substantial evidence standard of review.").

Further, "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). And "[i]n evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009). In fact, in evaluating the medical opinion evidence of record, "the ALJ is not only entitled but required to choose between" conflicting medical opinions. *Cotter*, 642 F.2d at 705.

## 2. Opinion Testimony.

The regulations regarding the evaluation of opinion evidence are different for claims filed before March 27, 2017 ("old regulations"), on the one hand, and for claims, like Kane's, filed on or after March 27, 2017 ("new regulations"), on the other hand. The new regulations applicable here have been described as a "paradigm shift" in the way medical opinions are evaluated. *Mercado v. Kijakazi*, 629 F. Supp. 3d 260, 279 (M.D. Pa. 2022). Under the old regulations, "ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy." *Id*. at 280. But under the new regulations, "[t]he range of opinions

21

that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Id.* Further, under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion. 20 C.F.R. §§ 404.1527(c), 416.967(c).

Under the new regulations, the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must explain how he or she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in" his or her determination or decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may, but is not required to, explain how he or she considered the remaining three factors in determining the persuasiveness of a medical opinion. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). But if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

22

Supportability and consistency are defined in 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  As the regulations provide, supportability means: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021), *adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas*, 2021 WL 363682, at *10.

**B. The ALJ's Evaluation of Dr. Berger's Opinion.**

With the above standards in mind, we address the ALJ's consideration of Dr. Berger's opinion.  Kane argues the ALJ erred by rejecting the opinion of the treating psychiatrist, Dr. Berger. *Doc. 14* at 4–5.  Specifically, Kane asserts that the ALJ erred in rejecting the opinion of Dr. Berger without addressing the opinion's supporting explanations and consistency with the evidence. *Id.* at 7.  Kane argues further that the opinion is supported by objective medical evidence and that the ALJ interpreted the agoraphobia diagnosis based upon his own non-expert opinion. *Id.* at 7–11.

The Commissioner counterargues that the ALJ's finding that Dr. Berger's opinion was inconsistent with the objective medical evidence was reasonable and fully supported by substantial evidence. *Doc. 16* at 7–12.  Specifically, the Commissioner argues that the ALJ adequately explained why Dr. Berger's opinion was not persuasive and that Dr. Berger's supporting explanations merely consisted of one general statement that Kane's agoraphobia made it difficult for her to function. *Id.* at 9–11.  Moreover, the Commissioner contends that the ALJ acknowledged Kane's abnormal findings but simply concluded that Dr. Berger's opinion was "contradicted by a fair number of objective findings, treatment notes . . . , [Kane]'s daily activities, and the prior administrative medical findings." *Id.* at 11–12.  We find that the Commissioner prevails as to his arguments.

Here, the ALJ found Dr. Berger's opinion unpersuasive. *Admin. Tr.* at 1973. In support of that finding, the ALJ reasoned that Dr. Berger's opinion was inconsistent with his findings on his own mental status examination of Kane, as well as the evidence of record. *Id.* The ALJ pointed to mental status examinations that failed to describe significant memory, attention, or concentration deficits. *Id.* And while the ALJ recognized that the examinations were positive for variations in mood, he determined that the objective evidence did not support the degree of limitations set forth by Dr. Berger, as the examinations were generally devoid of ongoing significant clinical abnormalities. *Id.*

Kane argues that the ALJ failed to address the following supporting explanations that Dr. Berger provided for his opinion: Kane "has agoraphobia w[ith] panic when she leaves the house[,] she either panics or is unable to function properly," "her anxiety and agoraphobia make it hard for her to function in any work capacity or in public," and "patient will be unable to function properly in a work setting or any public setting." *Doc. 14* at 7. However, the ALJ explicitly addressed Dr. Berger's reference of Kane's agoraphobia and panic when leaving the house. *Admin Tr.* at 1973. The ALJ pointed to treatment notes that recorded Kane's ability to attend a heavy metal rock concert, maintain friendships and family relationships, make plans to attend a picnic event, and donate plasma twice a week. *Id.* The ALJ further noted that Kane's testimony at the initial hearing of

25

her self-reported activities revealed she would drive to a friend's house once or twice per week. *Id.*  Accordingly, we find the ALJ sufficiently addressed Dr. Berger's explanation for his opinions.

As to Kane's argument that the evidence supports additional limitations, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder.'" (citation omitted)).  And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

Finally, consistent with the applicable regulations, the ALJ did not substitute his own lay opinion for that of Dr. Berger's.  Rather, as required, the ALJ supported his decision to reject Dr. Berger's opinion by citing numerous inconsistencies in the record as a whole and making specific references to the parts of the record with which the opinion conflicted.  We, therefore, find that substantial evidence supports the ALJ's evaluation of Dr. Berger's opinion here.

**C. The ALJ's Evaluation of Dr. Stone's Opinion.**

Kane also argues the ALJ seemingly accepted the portion of Dr. Stone's opinion regarding Kane's limitation to "only occasional reaching in all directions with the non-dominant left arm," but failed to include such limitation in the RFC without explanation. *Doc. 14* at 11–13.  The Commissioner argues that the ALJ found Dr. Stone's opinion to be only "partially persuasive" and that the ALJ adequately explained the omission of the limitation when read as a whole. *Doc. 16* at 12–17.

Here, we conclude that the ALJ adequately explained his decision.  In discussing Dr. Stone's opinion and finding it partially persuasive, the ALJ explained that "[w]hile the consultative examination itself, described in detail above[,] [] notes abnormal gait, reduced squat, and reduced *shoulder* and lumbar range of motion, it was otherwise generally within normal limits." *Admin. Tr.* 1972 (emphasis added).  The ALJ cited clinical examination findings, notations in Kane's medical records, and Kane's testimony regarding her lack of treatment as it pertained to her bilateral lower extremities. *Id.*  And zooming out from the ALJ's discussion of Dr. Stone's opinion to his discussion overall, the ALJ explained why at step three he found Kane was only limited to overhead reaching with the left upper extremity, citing the discrepancy between Kane's reports of pain and her medical records. *Id.* at 1969.  And in connection with his RFC assessment, the ALJ

27

reviewed in detail the medical records and unremarkable imaging results. *Id.* The ALJ further noted that Kane declined an offer of additional physical therapy and her request for pain medication was denied. *Id.* In sum, we conclude that the ALJ adequately explained how Kane's "objective diagnostic tests and clinical findings do not support greater functional limitations." *Id.*

As noted above, although a different factfinder may have imposed greater limitations, we cannot reweigh the evidence. *Chandler*, 667 F.3d at 359; *Rutherford*, 399 F.3d at 552. And "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy*, 306 F. App'x at 764.

In sum, the ALJ adequately explained his decision, and substantial evidence supports the ALJ's RFC assessment.

### D. The ALJ's Finding at Step Five.

Kane claims the ALJ failed to include the limitations set forth by Drs. Berger and Stone in the RFC and hypothetical question presented to the VE. *Doc. 14* at 14. Given the foregoing findings, we conclude Kane's argument is without merit. Alternatively, Kane claims that the ALJ's finding at step five is not supported by substantial evidence because the ALJ failed to identify and resolve an

apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT") concerning the reasoning level requirements of the three jobs identified by the vocational expert. *Id.* at 14–15. We conclude that there was no error regarding two of the three jobs at issue, and even if there was an error as to the third, any such error was harmless.

The Social Security Act provides that an individual is disabled only if he cannot do his previous work and if he cannot "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). And the Act further provides that "[f]or purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* Accordingly, "[a]t the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003) (footnote omitted). That inquiry has two components: one focused on the kind of jobs available to the claimant, and the

other focused on the number of such jobs. *Biestek*, 587 U.S. at 100. "The ALJ need[s] to identify the types of jobs [the claimant] could perform notwithstanding his disabilities." *Id.* "And the ALJ need[s] to ascertain whether those kinds of jobs 'exist[ ] in significant numbers in the national economy.'" *Id.* (quoting 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1)).

"To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from VEs [Vocational Experts]." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014). "'The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job.'" *Id.* (quoting *McHerrin v. Astrue*, No. 09-2035, 2010 WL 3516433, at *3 (E.D. Pa. Aug. 31, 2010)).

SSR 00-4p provides "that before relying on the VE or VS [Vocational Specialist] evidence to support a disability determination or decision," an ALJ "must[ ] [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational

30

Titles (SCO)," and explain "how any conflict that has been identified was

resolved." SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000).[8]  More

specifically, SSR-00-4p provides, in pertinent part:

> Occupational evidence provided by a VE or VS generally
> should be consistent with the occupational information supplied
> by the DOT. When there is an apparent unresolved conflict
> between VE or VS evidence and the DOT, the adjudicator must
> elicit a reasonable explanation for the conflict before relying on
> the VE or VS evidence to support a determination or decision
> about whether the claimant is disabled. At the hearings level, as
> part of the adjudicator's duty to fully develop the record, the
> adjudicator will inquire, on the record, as to whether or not
> there is such consistency.

*Id.* at *2.  SSR 00-4p continues that "[n]either the DOT nor the VE or VS

evidence automatically 'trumps' when there is a conflict." *Id.*  Rather, "[t]he

adjudicator must resolve the conflict by determining if the explanation given by the

VE or VS is reasonable and provides a basis for relying on the VE or VS testimony

rather than on the DOT information." *Id.*  And regarding reasonable explanations

---

[8] SSR 00-4p was rescinded by SSR 24-3p.  *See* SSR 24-3p, 89 Fed. Reg. 97158-01, 2024 WL 4988840 (Dec. 6, 2024).  SSR 24-3p became effective on January 6, 2025. *Id.* at *97158.  The Social Security Administration notes that it will use SSR 24-3p beginning on January 6, 2025, and it will apply it to new applications filed on or after that date and to claims that are pending on or after that date, but it "expect[s] that Federal courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions." *Id.* at *97159 n.1. Because the ALJ's decision is the final decision of the Commissioner in this case, and because the ALJ issued his decision on July 30, 2024, before the effective date of SSR 24-3p, SSR 00-4p is applicable here.

for conflicts or apparent conflicts, SSR 00-4p provides that "[e]vidence from VEs or VSs can include information not listed in the DOT." *Id.*  It acknowledges that:

> The DOT contains information about most, but not all, occupations. The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term "occupation," as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs. Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling.
>
> The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

*Id.* at *2–3.

Further, the Third Circuit has observed that "[b]y its terms, SSR 00–4p, 2000 WL 1898704 (S.S.A. Dec. 4) was designed to address the already-well-established (in this Circuit and elsewhere) obligation of an ALJ to develop the record during an adjudicative hearing." *Rutherford*, 399 F.3d at 556.  The Third Circuit has stated that "[a]s a general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT." *Zirnsak*, 777 F.3d at 617 (citing SSR 00-4p, 2000 WL 1898704, at *2).  And "[t]o ensure consistency, courts have imposed an obligation on ALJs to '[i]dentify and

obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT].'" *Id.* (citing SSR 00-4p, 2000 WL 1898704, at \*1; and *Rutherford*, 399 F.3d at 556). "Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Id.* (quoting *Burns*, 312 F.3d at 127). "An ALJ's failure to comply with these requirements may warrant remand in a particular case." *Id.* But the Third Circuit "has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* (quoting *Rutherford*, 399 F.3d at 557).

Here, the purported conflict involves the reasoning levels of the jobs identified by the VE, which the ALJ determined Kane could perform. Among other qualification categories, the DOT sets forth General Educational Development requirements, and among those requirements are reasoning development levels. *Id.* at 616. "Reasoning levels in the DOT range from level 1 to level 6." *Id.*

The ALJ in this case concluded that there are jobs that exist in significant numbers in the national economy that Kane could perform, and he cited three examples—office helper, postage machine operator, and mail clerk. *Admin. Tr.* at

33

1975.  The ALJ based that conclusion on the testimony of the vocational expert, who testified that a hypothetical individual of the same age, education, and work experience as Kane and who "can understand, remember and carry out simple instructions" could perform those jobs. *Id.* at 1975, 2008.  And the vocational expert testified that there are 17,000 jobs as office helper in the national economy, 21,000 jobs as postage machine operator in the national economy, and 23,000 jobs as mail clerk in the national economy. *Id.*  The ALJ asked the VE if her testimony was in accordance with the DOT, and the VE answered that it was with the exception of testimony regarding limitations not addressed in the DOT, which testimony was based on her vocational experience. *Id* at 1975, 2009.

The DOT classifies the occupations of office helper and postage machine operator as reasoning level 2 occupations. *See Dictionary of Occupational Titles* 239.567-010, 1991 WL 672232, and *Dictionary of Occupational Titles*, 208.685-026, 1991 WL 671757.  And the DOT classifies the occupation of mail clerk as a reasoning level 3 occupation. *See Dictionary of Occupational Titles*, 209.687-026, 1991 WL 671813.  Kane contends that there is a conflict between jobs that require a reasoning level 2 or 3 and the simple-instructions RFC determined by the ALJ. *Doc. 14* at 14–15.

We first address the jobs of office helper and postage machine operator, which require a reasoning level 2.  The DOT defines reasoning level 2 as the

34

ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *See Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702.  There is no conflict between a reasoning level 2 and the simple-instructions RFC in this case.  This is because "[w]orking at reasoning level 2 would not contradict the mandate that [a claimant's] work be simple, routine and repetitive." *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004); *see also Gerenza v. Bisignano*, No. 1:24-CV-00154, 2026 WL 27577, at *5 (M.D. Pa. Jan. 5, 2026) ("Because Gerenza is limited to 'simple instructions' rather than 'very short and simple' or 'short and simple instructions,' the jobs that the ALJ identified at step five which require reasoning level two are consistent with the RFC limitation."); *Edwards v. Comm'r of Soc. Sec.*, No. 3:23-CV-01590, 2025 WL 2844484, at *6 (M.D. Pa. Oct. 7, 2025) (finding "[u]pon review of the relevant case law in the Third Circuit, . . . that while a claimant who is limited to 'very short and simple instructions' or 'short and simple instructions' cannot perform jobs identified at reasoning level two, a claimant who is only limited to 'simple instructions' can" (quoting *Money*, 91 F. App'x at 215)); *Scott R. v. Kijakazi*, 643 F. Supp. 3d 483, 496 (D.N.J. 2022) (concluding that "[b]ecause Assembler, Small Products I, has a reasoning level of two, Plaintiff's argument" that there is an unresolved discrepancy between the

35

reasoning level and the RFC, "which limits him to unskilled, routine, repetitive tasks" "fails"); *Spallone v. Berryhill*, No. 3:17-CV-1152, 2018 WL 2771581, at *11 (M.D. Pa. Apr. 3, 2018) (concluding that "there simply is no irreconcilable conflict between the RFC assessment in this case, which called for Spallone to perform simple routine tasks, and the Step 5 determination that Spallone could perform work at reasoning level 2"), *report and recommendation adopted*, 2018 WL 2770646, at *1 (M.D. Pa. June 8, 2018).  And because there is no conflict, the ALJ did not err in relying on those jobs.

The other job identified by the ALJ—mail clerk—is a reasoning level 3 job. The DOT defines reasoning level 3 as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations." *See Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702.  Even assuming for the sake of argument that such a job conflicts with the simple-instructions RFC set by the ALJ and that the ALJ erred by failing to resolve such a conflict, any such error was harmless.

"Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).  Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.*

36

(quoting *Shinseki v. Sanders*, 556 U.S. 396, 413 (2009)).  "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (quoting *Renchenski v. Williams*, 622 F.3d 315, 341 (3d Cir. 2010)).

Here, because as discussed above, there are jobs—office helper and postage machine operator—that exist in significant numbers in the national economy that are consistent with Kane's RFC, any error regarding the job of mail clerk is harmless. *See Lighting-Sobkowski v. O'Malley*, No. 1:23-CV-00844, 2024 WL 3391104, at *1 (M.D. Pa. June 7, 2024) (agreeing with the "numerous judges within this District" who have "conclude[d] that if, even accounting for limitations that were improperly not addressed by an ALJ, there remains one job that exists in significant numbers in the national economy that the claimant is capable of performing, any error is harmless and remand is not required"); *Scott R.*, 643 F. Supp. 3d at 497 (reasoning that the court need not definitively answer the question whether the reasoning development levels for two other jobs conflict with the claimant's RFC, "which limits him to unskilled, routine, repetitive tasks" "because even assuming—without deciding—that this constitutes an error by the ALJ, it is certainly harmless" because "relying on the number of Assembler, Small Products I, jobs alone, . . . would support the ALJ's Step Five findings").

In sum, because any error regarding the job of mail clerk is harmless and because there is no conflict between the reasoning levels of the jobs of office helper and postage machine operator and Kane's RFC, the ALJ's step five analysis is supported by substantial evidence and there is no reversible error.

## VI.  Conclusion.

For the foregoing reasons, we will affirm the decision of the Commissioner. An appropriate order follows.

*__S/Susan E. Schwab__*
Susan E. Schwab
United States Magistrate Judge